**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| BORIS WOODARD and SUSAN | ) | |
| WOODARD, as Surviving Parents of | ) | |
| ANNA WOODARD, deceased; and | ) | CIVIL ACTION FILE |
| BORIS WOODARD, individually, | ) | NO. 1:14-cv-03710-RWS |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| THOMAS C. DEMPSEY, | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO EXCLUDE THE OPINIONS OF PLAINTIFFS' ACCOUNTING EXPERT JEAN-PASCAL GINGRAS

Come now the Plaintiffs and file this Response in opposition to Defendant's

Motion to exclude the testimony of accounting expert Jean-Pascal Gingras

respectfully showing as follows:

### INTRODUCTION

Defendant's Motion is completely dependent on the *ipse dixit* testimony of

his own hired expert, Dr. Bruce Seaman. Defendant's 37-page memorandum

repeatedly uses conclusory words such as "unreliable" (used 29 times) and "novel"

(used 16 times). However, Defendant never substantiates these conclusions with

anything other than a professional difference of opinion between Plaintiff's expert

(a CPA) and Defendant's expert (an economist).

Defendant's Daubert attack on Mr. Gingras repeatedly focuses on his "methodology." However, **Defendant chose not to tell the Court that his own expert, Dr. Seaman, testified to using the same methodology as Mr. Gingras** to calculate the economic damages related to lost wages, lost benefits and lost household production:

> "Q:  [M]echanically speaking, just in case this judge was asked about the methodology used by Mr. Gingras, you'd agree that he selected an amount of years that he projected Anna would have worked, right?
> **A:  Yes.**
> Q:  He projected a, a compensation amount that he thought Anna would have received throughout the course of her work career, correct?
> **A:  That's correct.**
> Q:  He utilized a discount rate to reduce that number to the present value?
> **A:  That's correct.**
> Q:  And you did the exact same thing?
> **A:  Yes.**"

Seaman Dep., p. 27:21 – 28:10; *see also* p. 106:23 – 108:7.

The differences that do exist between the experts stem from different *assumptions* the experts used regarding what age Anna Woodard would have retired, the value to be used for Anna's earning capacity, and the value to be placed on her household services.

## ARGUMENT AND CITATION OF AUTHORITY

## I.    JP GINGRAS IS AN EXPERIENCED CPA WHO FOLLOWED STANDARD ACCOUNTING METHODS TO ARRIVE AT HIS OPINIONS.

Mr. Gingras graduated with an accounting degree from St. Bonaventure University in 1994, with concentrations in finance, accounting and economics. He earned an M.B.A. in 1998 from the same school. Gingras Dep., p. 7:5-16. After passing the C.P.A. exam, he worked for three years at Alston & Bird where he was an in-house forensic accounting expert. Gingras Dep., p. 8:13-23; *see also* Exhibit A – Gingras CV. He later founded The Gingras Firm, LLC and has worked in forensic accounting in the litigation environment for more than 10 years.

Mr. Gingras has been licensed in the State of Georgia as a Certified Public Accountant (CPA) for the past fifteen years. He is also a Certified Fraud Examiner (CFE); a Forensic Certified Public Accountant (FCPA); a Certified Global Management Accountant (CGMA); a Certified Financial Crime Specialist (CFCS); and is Certified in Financial Forensics (CFF). Id.

As a forensic accounting professional, Mr. Gingras consults for attorneys as well as businesses, routinely performing economic analysis related to personal injury matters. Mr. Gingras is a member in good standing of a number of

professional organizations, including the AICPA, the Association of Certified Fraud Examiners, and the Georgia State Society of CPAs.  Id.

Mr. Gingras has testified 26 times in state and federal courts.  In this case, Mr. Gingras followed the same methodology that has already withstood multiple Daubert challenges.  Mr. Gingras followed the peer-reviewed guidance of the American Institute of Certified Public Accountants ("AICPA"), which is utilized by thousands of accounting professionals around the country.

Based on his extensive education, training and experience, Mr. Gingras is qualified, and has been qualified on multiple occasions, to testify.  Each of his opinions is supported by sufficient factual bases and reliable methodologies.  *See* Rule 26 Report attached as Exhibit B.  Defendant has presented the Court with no evidence to exclude him.

## II.   DEFENDANT'S DAUBERT CHALLENGE ASKS THE COURT TO RESOLVE DIFFERENCES IN OPINION BETWEEN THE EXPERTS.

While Daubert is a threshold means of keeping junk science out of the courtroom, the Supreme Court was clear that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 596

(1993).

In other words, a court's role as gatekeeper is not intended to supplant the role of the jury or the adversarial system.  Allison v. McGhan Med. Corp., 184 F.3d 1300, 1311 (11th Cir. 1999); *see also* Ambrosini v. Labarraque, 101 F.3d 129, 141 (D.C.Cir.1996) ("The district court[ ] err[ed] ... [by] misconce[iving] of the limited 'gatekeeper' role envisioned in *Daubert.* By attempting to evaluate the credibility of opposing experts and the persuasiveness of competing scientific studies, the district court conflated the questions of the admissibility of expert testimony and the weight appropriately to be accorded such testimony by a fact finder.").

The Eleventh Circuit has cautioned against elevating the trial court

> "to the role of St. Peter at the gates of heaven, performing a searching inquiry into the depth of an expert witness's soul - separating the saved from the damned.  Such an inquiry would inexorably lead to evaluating witness credibility and weight of the evidence, the ageless role of the jury."

Allison v. McGhan Medical Corp., 184 F.3d 1300, 1321 (11th Cir. 1999)(emphasis added), *citing* McCullock v. H.B. Fuller Co., 61 F.3d 1038, 1045 (2nd Cir.1995).

Defendant asks the Court to apply an exception to these clear rules because of a disagreement between its expert, an economist, and Plaintiffs' expert, a CPA. But, as one court explained:

> **"Simply because the experts disagree as to the most reliable method for calculating damages does not require the exclusion of [one expert's] opinion.** Such arguments go more to the weight of the evidence, than the admissibility of the evidence under *Daubert*. The certainty and correctness of [the expert's] opinion will be tested through cross-examination and presentation of contrary evidence and not by a *Daubert* challenge."

Taylor, Bean & Whitaker Mortg. Corp. v. GMAC Mortg. Corp., 2008 WL 3819752, *4 (M.D.Fla.2008) (emphasis added); *see also* Nature's Prods v. Natrol, Inc., 2013 U.S. Dist. LEXIS 185676 at *4 (S.D.Fla.2013) (finding that a CPA's testimony was sufficiently reliable in spite of arguments that he failed to take into account other methods or that other methods were more reliable).

Defendant's own cases emphasize the courts' limited duty to merely ensure that the fact-finder weighs sound and reliable evidence, and that courts "may not evaluate the credibility of the opposing experts" or the "persuasiveness of competing scientific studies." Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1340-41 (11th Cir. 2003) (emphasis added).

In Quiet Tech., the Court found that arguments regarding the expert's use of an incorrect formula and misuse of an otherwise reliable method were attempts to identify flaws in generally reliable scientific evidence, which was "precisely the role of cross-examination." Id. The Court explained, "in most cases, objections to

the inadequacies of a study are more appropriately considered an objection going to the weigh to the evidence rather than its admissibility." Id. at 1345 (citation omitted).

As shown below, Mr. Gingras is qualified to render the expert opinions proffered in his expert report, and Defendant's complaints of his expert opinions must be addressed during cross-examination at trial.

**A. DEFENDANT ASKS THE COURT TO EXCLUDE CPA GINGRAS BECAUSE OF DEFENDANT'S OWN EXPERT'S *IPSE DIXIT* AND DESPITE OF MR. SEAMAN'S ADMISSION THAT HE USES THE SAME METHODOLOGY.**

Determining economic damages in a personal injury case is not simply a matter of totaling the Plaintiffs' past medical bills, lost wages, and other types of economic damages. Accountants and other professionals are routinely enlisted as testifying experts to employ some fairly standard procedures to estimate the future economic damages related to lost wages.

Defendant repeatedly appears to take issue with Mr. Gingras' "methodology" in calculating lost wages and loss of household services. However, Defendant never argues that Mr. Gingras applied incorrect formulas or that his calculations are wrong.

Instead, the Defendant bases his complaints on Mr. Gingras' reliance on different assumptions about Anna's life in the future. Defendant argues that his

own expert's preferred assumptions render his expert's opinions "*more* accurate" and "*more* reliable." *See, e.g.,* Seaman Dep., p. 37:1 – 11, esp. 37:9-11 ("*it doesn't allow for this age-specific adjustment, which I believe is necessary to do this calculation more accurately.*"); p. 38:9-12; *and see* p. 42:9-12.

However, when cross-examined, Dr. Seaman repeatedly admitted that he used the same methodology as Mr. Gingras. Seaman Dep., p. 27:21 – 28:10; *see also* pp. 105:10-108:7, esp. 107:17-23; p. 23:13-15 (Regarding household services, "*Q: [. . .] And that's the methodology that you used?* **A: Yes.** *Q: And that's the methodology that he used?* **A: Although applied to, I think, an erroneous base, but he certainly did project, he did discount, he did do it to life expectancy**."); *and see* Seaman, pp. 23:25 – 24:2 ("*Now, I don't disagree with your assertion that* **that's a similar methodology**, *with the two variations in Case 1*."); *and see* pp. 17:25 – 18:4 (agreeing that his calculations in Scenario 1 are "materially similar" to Gingras'*); and* 22:25 – 23:6 (agreeing to using a similar methodology to Gingras for lost earnings).

Because both experts must rely on some assumptions to provide their opinions about what the future held for Anna, Dr. Seaman admits that he has no way to know whether his analysis would be more accurate than Gingras'. Seaman Dep., p. 42:25 – 43:5 ("*Q. [. . .] While we sit here today, you can't know that your*

*assessments as applied to Anna Woodard's life would be more accurate than Mr.*

*Gingras' assessments applied to Anna Woodard's life?* **A: That's true, but that's**

**always true**.").

Differing assumptions are not grounds for striking an expert.  *See* Berk-

Cohen Associates, L.L.C. v. Orkin Exterminating Co., 2004 WL 445132 (E.D. LA,

March 10, 2004) (holding that a challenge to an economist's underlying

assumptions did not render the opinions inadmissible under Rule 702).

1.    **Mr. Gingras' Calculations Concerning Lost Wages Withstand Daubert Scrutiny.**

The differences that exist between the experts on the issue of lost wages

stem from differing assumptions about: (1) at what age Anna would have retired

(*i.e.*, 65 years old versus 67 years old); (2) what level of education Anna would

have achieved; and (3) what wages or salary should be used as a starting point to

estimate Anna's earning capacity.

Mr. Gingras' 26-page report calculated 3 scenarios for the jury's

consideration:

- Scenario 1: Anna would have graduated with an Associate's degree in 2016 and would have started teaching preschool (her desired profession).  CPA Gingras used the 2012 median pay for preschool teachers based on the U.S. Bureau of Labor Statistics.

- Scenario 2: Anna would not have graduated with an Associate's degree and would have earned wages equal to the median earnings for individuals with a high school education.

- Scenario 3: Anna would have graduated with an Associate's degree in 2016 and would have earned the average hourly rate in the U.S. for 2016.

Exhibit B, esp. p. 9-11.

In all three scenarios, CPA Gingras used age 67 as the full retirement age, per the Social Security Administration.  Id. at p. 9-11.  He also presented numbers based on Anna's continuous work life based on the U.S. Bureau of Labor Statistics on preschool teachers.  Gingras Dep., p.33:23 – 34:15.

Mr. Gingras used median income figures throughout the assumed life span because the lower starting wages for someone new to the workforce average out the likely higher wages the person receives near the end of her career.  Gingras Dep., p. 29:14-19 (*"Q: If I'm understanding you correctly, by staying on the median and not making the adjustment it averages out in the end? A: That's correct.  Q: Okay.  A: Actually you are conservative, but yes."*).  Gingras recognized that attempting to parse out the wages of an entry-level preschool teacher and then try to factor in promotions over the course of a lifetime would be very speculative.  Gingras Dep., p. 34:16 – 35:2.

Mr. Gingras was clear that he opted for a conservative methodology. Gingras Dep., p. 29:14-19. Defendant's expert Mr. Seaman agreed. He testified that Mr. Gingras' method of using the median income – particularly when projecting the loss of income of a young person like Anna – was "more defensible" than other methods:

> " [. . .] These are risky enterprises, and this is one reason I applauded Mr. Gingras, and I share that view, that especially when you're dealing with a young person like this, with not a huge earnings history applicable to the case, that **the use of median earnings is more defensible**, because by definition median is going to be nonsensitive to either especially low earnings or to use median earnings whenever it was possible."

Seaman Dep., p. 69:8-19 (emphasis added).

Defendant chose not to inform the Court of his own expert's testimony. Instead, Defendant argued that "Gingras improperly and unreliably utilized median wages reported by the Bureau of Labor and Statistics in determining Anna's lost wages." Def's Brief, p. 9. This cannot be a basis for excluding Mr. Gingras.

**2.      Mr. Gingras' Loss of Services Calculations Are Appropriate.**

As with the testimony concerning lost wages, the differences with respect to the value of Anna's household services also relate to differing assumptions about: (1) how many hours would Anna have contributed to benefit the household

throughout her lifetime; and (2) what would be the replacement cost of every hour contributed by Anna.

When calculating the economic value of Anna's household production, Mr. Gingras used a 24-hour day as a baseline so that the jury could make the determination from the evidence how many hours Anna would have provided the services in the future. Gingras Dep., p. 52:7-23. He testified that it was up to the jury to decide what, if any, figures should be accepted. Gingras Dep., p. 46:15-21.

Mr. Gingras' expert report specifically states that:

> "Ms. Woodard's actual lost household production limitation **should be determined by the Trier of Fact**. This summary table (shown below) utilizes contributions of 20%, 40%, 60%, 80% and 100% *for illustration purposes only*. Testimony in this matter as well as other evidence should establish a basis for the Trier of Fact to determine what the appropriate percentage of limitation (i.e., 0% to 100% contribution) should be as this is a question of fact. No opinion is expressed as to the appropriate level of contribution within this Expert Report."[1]

Courts have previously qualified Mr. Gingras as an economic damages expert and admitted Mr. Gingras' expert opinions related to lost wages, lost benefits and lost household services utilizing the same methodology as he has done in this matter. The Defendants in the case of <u>Sophia Mott v. Surgical Associates,</u>

---

[1] Docket No. 103-2, p. 9 (emphasis added).

LLC, and Sidney L. Stapleton, MD, CAFN 09A11508-3, unsuccessfully attempted to move the court to exclude Mr. Gingras' expert opinions related to lost wages and lost household production.  At trial, Judge Purdom found that 1) Mr. Gingras qualified as an economic damages expert, 2) Mr. Gingras' methods, procedures and analyses (which were the same or similar to this matter) adequately met the requirements of Daubert and 3) that his methodology was reliable and would be helpful to the jury.

In the separate matter of Kelvin Taylor & Jackie Taylor v. Decatur Health Resource, Inc., Defendants also unsuccessfully attempted to move the court to exclude Mr. Gingras' expert opinions related to lost wages and lost household.[2]  In her order, Judge Johnson denied defendants' attempt to exclude Mr. Gingras' expert opinions relating to lost household production stating that:

> **Defendant argues that Mr. Gingras' lost production assessment accounts for all hours spent away from work, including the entire time that Plaintiff spends asleep.  This is simply incorrect.**  Mr. Gingras testified in his deposition and before this Court that his methodology provides and hourly "wage" to quantify Plaintiff's contribution to the home and it is incumbent upon *the jury* to actually apply that wage for however many hours per day that the jury sees appropriate.  Id. at pp. 4-5.

---

[2] Order attached as Exhibit C.

Defendant's motion raises the same issues that have been put forth in other matters in which Mr. Gingras has already faced and defeated Daubert challenges. Mr. Gingras' expert report specifically states that:

> To this amount, ***a coefficient of contribution should be applied by the Trier of Fact to determine the actual Loss of household production*** and activity for Ms. Woodard. For the purpose of this analysis, a range from 5% contribution to 95% contribution is presented using a 5% contribution increment by year (incremental loss of $505,391 per 5% contribution) for the benefit of the Trier of Fact. ***By utilizing the Trier of Fact to determine this assumption*** (*i.e.*, Ms. Woodard's percentage of contribution to the household), ***the value of the lost household production can be calculated with certainty*** (*i.e.*, not speculative) since the model no longer contains unknowns or variables and the methodology does not contain any element of conjecture.

Furthermore, and perhaps more troubling, is Defendant's assertion that "the generally accepted approach for projecting the value of lost household production is to follow data contained in the American Time Use Survey, which is the data source used by the Dollar Value of a Day" which unequivocally contradicts Dr. Seaman's previous testimony in another case. In Johnny Bates and Patricia Bates v. Michelin North America, Inc., Dr. Seaman testifying for defendant, advocated for the use of actual testimony instead of the utilization of surveys:[3]

---

[3] Transcript attached as Exhibit D.

> ***We have evidence from a deposition*** from Mrs. Bates about exactly what he [Mr. Bates] had been doing and what they have had to incur as expenses in the absence of his being able to do it***.  That is a better fact than the survey.  It is more case specific than the survey.***  Id. at p. 69:4-8.

. . .

> I don't see why this is complicated.  It is not somebody's recall.  ***It is not somebody's reference to either the American Time Use Survey or the Michigan survey.  It is specific facts in evidence.***  Id. at p. 73:2-7.

Mr. Gingras' approach is exactly the type of analysis for which Dr. Seaman militated, employed, and advocated for in his calculation of the estimated lost household production in <u>Johnny Bates and Patricia Bates v. Michelin North America, Inc</u>.  Plaintiffs are baffled at Dr. Seaman's criticism of the exact methodology he previously advocated for in another case.  Mr. Gingras' expert opinions concerning Ms. Woodard's lost household services should not be excluded under these circumstances.

**B.  DEFENDANT INAPPROPRIATELY CRITICIZES GINGRAS FOR NOT MAKING SPECULATIVE "ADJUSTMENTS."**

Multiple sections of Defendant's brief criticize Gingras for "adjustments" he did not make:

- "fail[ing] to make adjustments for age, gender, educational attainment, and geographical attainment" – Brief p. 10;

- "Adjust[ing] for Anna's work-life expectancy and projected years to final separation from the work force" – Brief p. 13; and

- "Fail[ing] to account for the possibility that Anna would not work full-time year round" – Brief p. 15.

But, in his deposition, Dr. Seaman admitted that there was no industry standard that defines what a notable difference in adjustments actually is. Seaman Dep., p. 39:17 – 40:9. ***This is because the "adjustments" are merely differences in the assumptions that Mr. Seaman chose to use.*** Differing assumptions do not equate to faulty methodology under Daubert.

In this case, Mr. Gingras chose the more conservative route of adopting *fewer* assumptions. For example, Mr. Gingras recognized that he should not parse his economic analysis by sex because it is not necessarily true that female preschool teachers make less than male counterparts. Gingras Dep., p. 32:11-23. If Mr. Gingras adopted more assumptions, Defendant would have still challenged his testimony – only this time arguing that it was too speculative.

The Court should note that in spite of the alleged errors in Mr. Gingras' choice to include fewer adjustments, the two experts only have a total difference in lost earnings of $173,273, $843,354, and $1,064,622 in Gingras' Scenarios 1-3,

respectively. Seaman R. 26 Report, p. 3. A breakdown of the numbers in Exhibit E shows how small these differences actually are.

Even if these differences were greater, the differences would go to the weight of the testimony only. *See, e.g.,* <u>Bazemore v. Friday</u>, 478 U.S. 385, 400 (1986) ("[n]ormally, failure to include variables [of race, education, tenure, and job title] will affect the analysis' probativeness, not its admissibility.").

Furthermore, Defendant repeatedly asserts that Mr. Seaman "tested" Mr. Gingras' figures and concluded that they were "simply wrong." The fact is that this "testing" never happened. It is nowhere in Mr. Seaman's Rule 26 report. What *did* happen was that Mr. Seaman evaluated Mr. Gingras' testimony *based on his own assumptions* about what variables should have been used in the calculations. The citations in Defendant's brief about "testing" are merely Dr. Seaman's own *ipse dixit*. *Compare, e.g.,* Def's Brief at p. 3 *and* Seaman Dep., p. 37:9-11; 38:1; Seaman Dep., p. 42:1-15.

It is axiomatic that differing assumptions are not grounds for striking an expert.

###### C. MR. SEAMAN'S CRITIQUE OF THE AICPA GUIDELINES IS A RED HERRING *BECAUSE HE IS NOT A CPA.*

Defense expert Seaman is critical of the AICPA guidelines.  However, he is *an economist, not an accountant.*[4]  Mr. Seaman admittedly knows very little about the AICPA. Seaman Dep., p. 32:9-13 ("*I really don't spend much time dealing with that organization.*").  Thus, it is no surprise that Defendants argue that Mr. Seaman "would never and has never used the AICPA guidelines."  Def's Brief at p. 8.

However, courts regularly accept testimony based on the AICPA's guidelines because they provide  "valuable guidance" to a financial expert's work. Floorgraphics, Inc. v. News. Am. Mktg. In-Store Servs., 546 F. Supp. 2d 155 (N.J.D.C. 2008) (citing AICPA Practice Aid 06-4 "*Calculating Lost Profits*" in finding a particular valuation method was "recognized by experts in the field as an acceptable method"); *and see* Leon v. Kelly, 2009 U.S. Dis. LEXIS 39010 (D.N.M. 2009) (methodology based in part on the AICPA was found reliable).

Further, because Mr. Seaman is not an accountant, he has no idea why the AICPA used the term "non-authoritative" in its guidelines.  Seaman Dep., p. 60:7-15, *esp.* lns. 13-15 ("*They were probably trying to be cautious about somebody using method in there and into trouble. I don't know.*").  But the argument about

---

[4] In fact, Seaman repeatedly mis-referenced the AICPA as the "AI*PCA.*" Seaman Dep., p. 29:17; p. 30:5; 32 and Rule 26 Report p. 2-3.

the phrase "non-authoritative" only confirms that Defendant does not understand the largest accounting association in the world.[5]

"Authoritative" guidelines are such because publicly traded companies are required to follow them when preparing financial statements to be filed with the Securities and Exchange Commission (SEC).[6] Any and all other professional accounting guidance (*i.e.*, business valuation, lost profits, economic damages) fall under the "non-authoritative" guidelines because they are not required by the SEC. Id.

The calculations and principles Mr. Gingras used are well established and are used by CPAs in forensic analysis. They are routinely accepted by courts around the country, and they are subject to testing during cross-examination. Dr. Seaman's unfamiliarity with the AICPA is no bar to Mr. Gingras' testimony in this case.

## **CONCLUSION**

For the reasons stated above, Plaintiff respectfully requests that the Court deny Defendant's Motion in its entirety or in the alternative, permit oral argument

---

[5] *See* http://www.aicpa.org/About/Pages/About.aspx. The AICPA has 412,000 members in 144 countries.

[6] Exhibit F – Affidavit of Jean-Pascal Gingras.

on this issue to address any specific questions the Court may have.

This the 16th day of December, 2015.

Respectfully submitted,

*/s/ D. Dwayne Adams*
MICHAEL L. NEFF
Georgia Bar No. 537180
D. DWAYNE ADAMS
Georgia Bar No. 140406
*Attorneys for the Plaintiffs*

**The Law Offices of Michael Lawson Neff, P.C.**
Resurgens Plaza, Suite 1770
945 E. Paces Ferry Road
Atlanta, Georgia 30326
(404) 531-9700
(404) 531-9727 Fax
mneff@mlnlaw.com
ddadams@mlnlaw.com

I certify that the above document has been prepared in Times New Roman

(14 point) font and thus satisfies the font size requirements of this Court.

Dated: The 16th day of December, 2015.

*/s/ D. Dwayne Adams*
D. DWAYNE ADAMS
Georgia Bar No. 140406

**The Law Offices of Michael Lawson Neff, P.C.**
945 E Paces Ferry Road NE, Suite 1770
Atlanta, Georgia 30326
(404) 531-9700 - Telephone
(404) 531-9727 – Facsimile

## CERTIFICATE OF SERVICE

I hereby certify that I have on this day served a copy of the foregoing

**PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO EXCLUDE**

**THE OPINIONS OF PLAINTIFFS' ACCOUNTING EXPERT JEAN-**

**PASCAL GINGRAS** by filing it electronically with the Clerk of Court using

CM/ECF, which will automatically send email notification of such filing to the

following attorneys of record:

Wayne S. Melnick
Abby A. Vineyard
Freeman Mathis & Gary, LLP
100 Galleria Parkway, Suite 1600
Atlanta, GA 30339

This 16th day of December, 2015.

/s/ *D. Dwayne Adams*
D. DWAYNE ADAMS
Georgia Bar No. 140406

**The Law Offices of Michael Lawson Neff, P.C.**
945 E Paces Ferry Road NE, Suite 1770
Atlanta, Georgia 30326
(404) 531-9700 – Telephone
(404) 531-9727 – Facsimile