IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| BORIS WOODARD and SUSAN WOODARD, as Surviving Parents of ANNA WOODARD, deceased; and BORIS WOODARD, individually, | ) ) ) ) ) | CIVIL ACTION FILE NO. 1:14-cv-03710-RWS |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| THOMAS C. DEMPSEY, | ) ) | |
| Defendant. | ) | |

**DEFENDANT'S REPLY TO PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO EXCLUDE OPINIONS OF PLAINTIFFS' IDENTIFIED ACCOUNTING EXPERT JEAN-PASCAL GINGRAS**

COMES NOW defendant Thomas C. Dempsey ("defendant") and, pursuant to Local Rule 7.1 (C), submits his reply to plaintiffs' response in opposition to defendant's motion to exclude the opinions of plaintiff's identified accounting expert witness, Jean-Pascal Gingras, showing the Court as follows:

**I.     ARGUMENT AND CITATION TO AUTHORITY**

**A. Plaintiffs Try to Frame Dr. Seaman's Criticism of Gingras as a Mere "Professional Difference of Opinion" Rather Than Acknowledging That Gingras Used Unreliable Methodology.**

Plaintiffs argue that defendant's motion is based entirely on a "professional difference of opinion" as opposed to the reality that Gingras utilized unreliable

methodology.  Pls' Resp. to Def's Daubert Mot. [Doc. #114] pp. 1, 5.  They repeatedly try to convince the Court that defendant's complaint only relates to Gingras' credibility and the persuasiveness of his methodology.  [Doc. #114] pp. 5-6.  However, as is evident in defendant's initial brief, defendant is not merely challenging the strength of Gingras' methodology.  Rather, defendant presented evidence establishing that Gingras' methodology, which is unsupported by any of his cited guidelines, is altogether unreliable and should not be presented to a jury for consideration.

Unreliable and speculative methodology is precisely what <u>Daubert</u> aims to exclude.  <u>Daubert</u>, 509 U.S. at 590 (stating that an expert's methodology must be consistent with the "methods and procedures of science" rather than being founded on "subjective belief or unsupported speculation").  If an expert is unable to support his conclusions with "sufficient data or reliable principles," his conclusions are, simply, inadmissible.  <u>McClain v. Metabolife Intern., Inc.</u>, 401 F.3d 1233, 1240 (11th Cir. 2005).  Plaintiffs cite to <u>Quiet-Tech. DC-8, Inc.</u> for the principle that <u>Daubert</u> is not intended to evaluate "the persuasiveness of competing scientific studies."  [Doc. #114] p. 5.  However, this is not an instance of "competing scientific studies" or a mere "difference of opinion" between defendant's expert, Dr. Bruce Seaman, and Gingras.  The "difference" between the two experts lies not

in the opinion as to which approach is best, but instead in the fact that Dr. Seaman adheres to accepted methodology in the economic community while Gingras fails to follow any recognized methodology and instead utilizes an innovative and previously-untested approach that is not supported by any guidelines or recognized by any authority. Gingras' conclusions fall "outside the range where experts might reasonably differ, and where the jury must decide among the conflicting views of different experts, even though the evidence is 'shaky.'" Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 153 (1999) (citing Daubert, 509 U.S. at 596)).

## B. Gingras and Dr. Seaman Did Not Use the Same Methodology.

In an attempt to mislead the Court, plaintiffs argue that defendant's expert Dr. Seaman "admitted that he used the same methodology as Mr. Gingras." [Doc. #114] p. 8. However, they only included selective deposition transcript excerpts that do not provide sufficient context for Dr. Seaman's testimony and they are oversimplifying the concept of "methodology." When asked whether he used the same methodology as Gingras, Dr. Seaman consistently qualified his answers when they were in the affirmative. For example, Dr. Seaman testified,

> I know you want me to say it's the exact same methodology. In some sense, if you just want me to say are we both calculating numbers? Yes. If that's methodology, then that's true, we're both calculating numbers. If you want to define methodology that broadly, I do not disagree.

Seaman Dep. 30:12-18.  However, it is clear from Dr. Seaman's testimony and expert report that he does not believe Gingras' methodology is reliable or consistent with accepted practices in the economic community.

It is true that Gingras and Dr. Seaman agree that, to calculate lost wages, one must project an amount of years a decedent would have worked and the compensation a decedent would have earned before reducing the amount to present value.  Id. at 27:21-28:10.  Plaintiffs would have the Court believe the inquiry stops there since the two experts share opinions on *how* a lost wages analysis begins.  See [Doc. #114] pp. 8-9.  Boiled down, plaintiffs' position is that, by putting four wheels on a box to make it roll, a child's soapbox racer is built using the same vehicle engineering methodology Porsche uses when producing a Carrera because Porsche also puts four wheels on its cars.

As detailed in defendant's initial brief, Gingras failed to follow the accepted methodology and account for data and variables that were accessible to him.  Instead, Gingras made sweeping and overgeneralized assumptions about Anna's work life (e.g., that she would work until the full Social Security retirement age—which is directly contradicted by the very guidelines Gingras claims to follow [from the AICPA], that she would work full-time throughout the course of her career, etc.).  By contrast, Dr. Seaman utilized more case-specific data and

incorporated variables, which is the accepted method for calculating lost wages in the economic community. Seaman Dep. 34:1-5, 37:9-16, 38:1-8.

The same is true regarding the two experts' methodologies in calculating lost household production. Although Dr. Seaman agrees with Gingras that it is necessary to project a life expectancy and calculate "an economic value to apply to the value of household services," Dr. Seaman made it clear that Gingras' used "erroneous" methodology to determine that value and calculate projected lost household production. Id. at 105:10-107:22.

Additionally, despite plaintiffs' claim that Seaman did not actually "test" Gingras' methodology, Seaman tested Gingras' methodology by comparing Gingras' results to figures obtained via acceptable methodology in the economic community and found that Gingras' methodology produced vastly inflated projections. Gingras Dep. 29:14-17; [Doc. #103-3] pp. 2-3 (page numbers coincide with the actual expert report). Gingras' unprecedented methodology is inherently flawed and contrary to acceptable methods in the economic community of projecting these types of losses. Seaman Dep. 38:1-8, 73:20-21.

> a. *Plaintiffs' Attempt to Minimize the Differences Between Gingras' Methodology and Dr. Seaman's Methodology is Misleading.*

Plaintiffs attempt to minimize the impact of the differing methodologies on the amounts each produced. They argue that "the two experts only have a total

difference in lost earnings of $173,273, $843,354, and $1,064,622 in Gingras' Scenarios 1-3, respectively." [Doc. #114] pp. 16-17. Defendant acknowledges that, if a jury were to accept Gingras' "scenario 1" *and* utilize a low rate (for example, the 5% value) for Anna's lost household production, the calculations are not vastly different. However, beyond Gingras' scenario 1, the two experts determined vastly different amounts, and it is clear that variances of $843,354.00 and $1,064,622.00 are anything but "small" differences. Id. at 17.

Additionally, as discussed both in defendant's initial brief and in more detail below, Gingras presents a 100% value for household production as a baseline (showing the value of Anna spending 100% of her life performing household services) and then would leave it to the jury to figure out what the "actual" value should be without any guidance. Gingras Dep. 46:12-14, 52:17-20. This means there is a great likelihood that a jury will *not* choose the 5% household production value and therefore the difference in calculations could be monumental. Even using Ginrgas' 20% exemplar valuation for household production, when combined with Gingras' lost wages calculations, the differences in the amounts the two experts produced are $1,676,068.00, $2,346,149, and $2,567,417 in Gingras' scenarios 1-3, respectively. [Doc. #103-3] p. 5. Those differences are not "small."

Yet another manner in which plaintiffs attempt to convince the Court that Gingras' flawed methodology does not have a weighty impact on plaintiffs' claimed damages is by referring to Dr. Seaman's utilization of 65, as compared to Gingras' utilization of 67, as the projected retirement age for Anna. [Doc. #114] p. 9. However, they overlook the detailed analysis relating to calculating lost wages that Dr. Seaman included in his report (and testified about during his deposition).

Dr. Seaman both testified and included in his report that proper methodology takes into account *work-life expectancy* in addition to years to final separation data rather than assuming a person will work until the full-benefits Social Security Retirement Age. <u>Seaman Dep.</u> 30:4-11, 56:17-19, 79:23-80:6; [Doc. #103-3] pp. 5-6. Although the age a person in Anna's demographic typically leaves the workforce at age 65, it is important to take into account the work-life expectancy, as noted several times in Seaman's deposition testimony and report. As explicitly stated in Dr. Seaman's report, work-life expectancy data dictates that the *maximum* projected age of Anna's retirement, when taking into account her demographic, is 59.5 (rather than 67, as Gingras concluded). [Doc. #103-3] pp. 5-6, ¶ 13. The difference between earning wages until age 67 as opposed to 59.5 is vast and highlights another reason why the Court should exclude Gingras from testifying.

### C. Even if Some *Steps* in Gingras' Methodology Comported With Accepted Economic Standards, Several Aspects of His Methodology Render it Inherently Flawed, and, Therefore, it Fails a <u>Daubert</u> Analysis Overall.

Plaintiffs try to distract the Court from defendant's concerns by pointing out that Dr. Seaman agrees with certain *steps* of Gingras' methodology. [Doc. #114] pp. 8-9. For example, both experts agree that a lost wages calculation involves certain projections, and Dr. Seaman agrees with Gingras' use of median (instead of average) amounts.[1] However, that does not mean Dr. Seaman agrees with Gingras' methodology overall. Despite those minor agreements, Dr. Seaman's conclusion is that Gingras uses inherently flawed methodology that is not generally accepted in the economic community. <u>Seaman Dep.</u> 38:1-8, 73:20-21.

This is consistent with federal <u>Daubert</u> analysis which holds that "any step that renders the analysis unreliable…renders the expert's testimony inadmissible. **This is true whether the step completely changes a reliable methodology or merely misapplies that methodology.**" <u>In re Paoli R.R. Yard PCB Litigation</u>, 35 F.3d 717, 745 (3d Cir. 1994) (emphasis added). Even if Gingras began with an acceptable *framework* for determining lost wages and lost household production (i.e., projecting values and making certain assumptions), he misapplied, if not

---

[1] However, as noted in defendant's initial brief supporting his motion to exclude Gingras, Gingras unjustifiably shifts to using average wage rates for his analysis of one of "scenarios" he presented in his expert report. <u>Seaman Report</u>, p. 3.

completely changed, the methodology that is accepted in the economic community, and, therefore, rendered his methodology unreliable with the result being that his testimony should be excluded.

An application of this principle is found in Kumho Tire Co., Ltd. v. Carmichael. In Kumho Tire, the plaintiffs proffered expert testimony that a tire defect caused the tire to fail, which the expert concluded using his own four-metric system. 526 U.S. at 144. If he did not observe at least two of four signs of tire abuse, he opined the tire failed due to a manufacturing defect. Id. The Supreme Court upheld the lower courts' exclusion of the expert's testimony, noting that "the specific issue before the court was not the reasonableness *in general* of a tire expert's use of a visual and tactile inspection to determine whether [the tire had a defect that caused it to fail]. Rather, it was the reasonableness of using such an approach, along with [the tire expert's] particular method of analyzing the data thereby obtained, to draw a conclusion regarding *the particular matter to which the expert testimony was directly relevant*." Id. at 153-54 (emphasis in original).

Similar circumstances are present here: the issue is not whether Gingras' use of projected lost wages or presumed retirement age, etc. is reasonable; instead, the issue is the reasonableness of using that approach in conjunction with Gingras' original, previously-untested methodology to draw the conclusions he reached

particular to the facts in this case. Defendant agrees it is necessary to utilize projected earnings and projected retirement age, etc. to come up with a decedent's calculated lost wages and lost household production. However, the specific *manner* in which Gingras came up with those calculations is a flawed application of projecting these types of losses and is unsupported in the economic community.

Gingras' methodology was also tested against regularly-utilized methodology for determining such calculations and found to be inaccurate. It is Gingras' *particular* method of determining lost wages and lost household production that causes his opinions to fail a Daubert analysis, even if his method begins with a similar framework as is accepted in the economic community.

**D. Gingras Did NOT Use the Same Methodology in the Cases Where he Survived Daubert Challenges.**

Plaintiffs claim Gingras' novel methodology has already survived Daubert challenges and, therefore, the Court should allow him to testify in this case. [Doc. #114] pp. 12-13. However, plaintiffs did not include *any* support for their claim that, in Sophia Mott v. Surgical Associates, LLC, et al., the judge found Gingras' methodology reliable. They generally state that Gingras' methods and procedures in that case "were the same or similar to this matter" and that they "adequately met the requirements of Daubert." Id. They did not produce any exhibits or otherwise cite to support for that claim, and, therefore, the Court should not consider it.

Plaintiffs did, however, include the order from <u>Kelvin Taylor and Jackie Taylor v. Decatur Health Resource, Inc.</u>, which denied a defendant's motion to exclude Gingras from testifying. <u>Exhibit C to [Doc. #114]</u>. That order is inapposite because the order makes clear the judge was under the impression that Gingras utilized statistics from the Dollar Value of a Day to determine the number of hours per week a person spends on household services. <u>Id.</u> at 3-4. The judge made its determination at least in part on the basis that Gingras supposedly utilized data from recognized sources in calculating lost household production. <u>Id.</u>

To the contrary, in this case Gingras admitted that, despite his awareness that the Dollar Value of a Day provides the number of hours per week a fully-employed person spends on household services, he chose *not* to use that data and instead used his novel approach of assuming a person can perform household services 24 hours per day, 7 days per weeks, and 365 days per year. <u>Gingras Dep.</u> 49:25-50-9; <u>Seaman Dep.</u> 100:12-14. The <u>Taylor</u> Order also states that Gingras used "the **minimum wage** as a baseline for assessing loss of household production." <u>Exhibit C to [Doc. #114]</u> p. 4 (emphasis added). Yet, in this case, plaintiffs and Gingras apparently believe that Dr. Seaman's use of $10.17 per hour—the industry-standard median wage rate for the household services categories in this region—is too low. <u>See</u> <u>generally</u> [Doc # 103-2]; <u>Seaman Dep.</u>

95:2-103:-5.  Gingras' opinions in Taylor and his conclusions in this case are distinct, and, Taylor provides no support for plaintiffs.

### E. Plaintiffs' Argument that Dr. Seaman's Testimony Conflicts with His Previous Testimony in Another Case is a Red Herring.

Plaintiffs attempt to distract the Court from the issue of Gingras' unreliable methodology by claiming that Dr. Seaman's testimony in this case "unequivocally contradicts [his] previous testimony in another case." [Doc. #114] p. 14. This is simply untrue. Plaintiffs again provided selective context when explaining that Seaman advocated for the use of actual, case-specific evidence—rather than sole reliance on surveys—in determining a decedent's projected lost household production. Id.

It is true that Seaman stated in the Bates case—and still believes—that direct, case-specific evidence of a decedent's household production and/or the actual replacement cost of the same should be utilized, if available, over surveys. Exhibit D to [Doc. #114], pp. 69:4-8, 73:2-7 (page numbers coincide with actual deposition transcript); Affidavit of Dr. Bruce Seaman (attached as "Exhibit 1"). This notion is *not* inconsistent with Seaman's practice (which is employed in the economic community) of *taking into as much case-specific information as possible* and only utilizing surveys *if such information is unavailable*. Seaman Dep. p. 38:1-8 (noting that "generally accepted practices would try to incorporate as much

information as possible, based on the facts of the specific case" but that, in the absence of such information, "there are available data generally relied upon" that provide information typically reflective of a certain class of people); Exhibit 1.

Dr. Seaman's testimony in Bates plainly shows the significant differences in Bates and this case. In Bates, Dr. Seaman noted there was specific evidence "about exactly what [the decedent] had been doing and what [the decedent's surviving family] have had to incur as expenses in the absence of his being able to do it. That is a better fact than the survey. It is more case specific than the survey." Exhibit D to [Doc. #114], pp. 69:4-9. For instance, in Bates, there was direct evidence of some of the household services the decedent performed and *exactly how much it cost the decedent's surviving family to replace those services.* Id. at 71:1-6; Exhibit 1. However, Dr. Seaman noted that, in the absence of certain additional data, "it is not unusual to do what [the opposing expert] did which is just to use survey data." Exhibit D to [Doc. #114] pp. 70:1-6; Exhibit 1. Dr. Seaman took issue with the opposing expert's use of *outdated* survey data not his use of survey data in general. Exhibit D to [Doc. #114], pp. 70:7-8 (Dr. Seaman stated "I believe he should have used more recent survey data"). Dr. Seaman advocates for the use of survey data in the absence of direct, case-specific data, and has not contradicted him testimony in this case because no such data is available.

- 13 -

Another distinction between Bates and this case is the decedent's age. The Bates decedent was 63, whereas Anna was 25 at the time of her death. Exhibit 1. The Bates decedent had a much longer history to analyze and cite specific instances of the decedent's household production. Anna was still in school and living with her parents at the time of her death and therefore had not established a long history as an independent adult performing household services for her family. Id. More importantly, there is no specific evidence of Anna's lost household production or the *actual* cost (if any) Anna's family has expended to replace such lost production. Id. Those are key differences from the Bates case.

The irony of plaintiffs' argument on this topic lies in Gingras *not* advocating for the use of case-specific information or survey data, but instead wanting to show a jury what one hundred percent of the total production Anna could have possibly produced is and telling them to figure it out themselves. Gingras Dep. 46:12-14, 52:17-20. For the reasons discussed above, the Court should not be distracted by plaintiffs' "red herring" argument relating to Dr. Seaman's alleged contradiction of himself.

**F. Gingras Failed to Follow Even the Guidelines on Which he Claimed to Rely and, Therefore, His Methodology is Unreliable.**

Plaintiffs try to minimize the impact of Dr. Seaman's testimony by pointing out that Dr. Seaman—an economist—is not a certified public accountant and

- 14 -

allegedly does not understand the purpose and scope of the AICPA guidelines. [Doc. #114] pp. 17-19. They argue that "courts regularly accept testimony based on the AICPA's guidelines." Id. at p. 18. Dr. Seaman, although surprised at Gingras' frequent citation to the AICPA guidelines, never argued that they were a completely illegitimate source of information (even though economists typically tout other guidelines when determining lost wages and lost household production). See Seaman Dep. 59:14-19. The issue is that Gingras *claims* to rely on the AICPA guidelines yet does not actually follow them when calculating Anna's lost wages and lost household production (as is discussed in great detail throughout defendant's initial brief). See, e.g. Seaman Dep. 55:11-14, 79:23-80:6, 101:20-22; [Doc. #103-3] p. 2.; Exhibit 1. Because Gingras did not follow the very guidelines on which he claimed to rely, his methodology is unreliable and his testimony should be excluded.

## III. CONCLUSION

For the reasons discussed above and in defendant's initial brief, defendant respectfully requests that the Court to grant defendant's motion to exclude Gingras' testimony and opinions.

[SIGNATURE ON NEXT PAGE]

Respectfully submitted,

FREEMAN MATHIS & GARY, LLP

*/s/ Abby A. Vineyard*
Wayne S. Melnick
Georgia Bar No. 501267
wmelnick@fmglaw.com
Abby A. Vineyard
Georgia Bar No. 570288
avineyard@fmglaw.com

Attorneys for Defendant

100 Galleria Parkway
Suite 1600
Atlanta, Georgia 30339
(770) 818-0000 (Telephone)
(770) 937-9960 (Facsimile)

**CERTIFICATE OF SERVICE**

I certify that I have this day electronically submitted the foregoing **DEFENDANT'S REPLY TO PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO EXCLUDE OPINIONS OF PLAINTIFFS' IDENTIFIED EXPERT JEAN-PASCAL GINGRAS** to the Clerk of Court using the CM/ECF system which will automatically send electronic mail notification of such filing to counsel of record who are CM/ECF participants and mailed by United States Postal Service, first-class, postage prepaid, a paper copy of the same document to counsel of record who are non-CM/ECF participants. Counsel of record is:

Michael L. Neff, Esq.
D. Dwayne Adams, Esq.
T. Shane Peagler, Esq.
Susan M. Cremer, Esq.
The Law Offices of Michael Lawson Neff, P.C.
945 E. Paces Ferry Road, NE
Suite 1770
Atlanta, Georgia 30326

This 13th day of January, 2016.

/s/ Abby A. Vineyard
Abby A. Vineyard
Georgia Bar No. 570288
avineyard@fmglaw.com

Attorney for Defendant

FREEMAN MATHIS & GARY, LLP
100 Galleria Parkway
Suite 1600
Atlanta, Georgia 30339
(770) 818-0000 (Telephone)
(770) 937-9960 (Facsimile)